**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **FELTON N. JACKSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:18-cv-00631** |
| | ) | **Judge Trauger** |
| **GRADY PERRY, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

<u>**MEMORANDUM**</u>

Felton N. Jackson, a *pro se* state prisoner, filed a petition for the writ of habeas corpus under 28 U.S.C. § 2254 (Doc. No. 1) to which the respondent filed an answer (Doc. No. 12). The petitioner filed an untimely reply, asserting new arguments and claims. (Doc. No. 13.) The respondent filed a sur-reply (Doc. No. 16), and the petitioner filed a "surrebuttal" (Doc. No. 24). In the surrebuttal, the petitioner requests a stay of this action pending the resolution of a motion to correct illegal sentence currently pending in state court. (*Id.* at 1.) The respondent opposes a stay. (Doc. No. 29.) For the following reasons, the petitioner is not entitled to relief under Section 2254, his request for a stay will be denied, and this action will be dismissed.

**I.      Procedural Background**

In May of 2011, a Wilson County jury convicted the petitioner of especially aggravated robbery and aggravated assault. (Doc. No. 11-1 at 77–78.) The trial court sentenced the petitioner to 25 years' imprisonment. (*Id.*) The Tennessee Court of Criminal Appeals ("TCCA") affirmed the petitioner's convictions,[1] and the Tennessee Supreme Court denied the petitioner's application

---

[1] The TCCA remanded "for entry of a single judgment of conviction noting merger of the aggravated assault conviction into the especially aggravated robbery conviction," *Jackson*, 2013 WL 5675466, at *1, and the trial court complied (Doc. No. 11-12 at 8).

for permission to appeal. *State v. Jackson*, No. M2012-00828-CCA-R3CD, 2013 WL 5675466 (Tenn. Crim. App. Oct. 17, 2013), *perm. app. denied* Mar. 4, 2014.

The petitioner then filed a *pro se* post-conviction petition (Doc. No. 11-12 at 42–61),[2] the court appointed counsel (*id.* at 62–63, 69), and the petitioner filed an amended petition (*id.* at 75–80). The post-conviction court held a hearing (Doc. No. 11-13) and denied relief (Doc. No. 11-12 at 85–92). The TCCA affirmed, and the Tennessee Supreme Court denied discretionary review. *Jackson v. Tennessee*, No. M2016-00490-CCA-R3-PC, 2017 WL 2117027 (Tenn. Crim. App. May 15, 2017), *perm. app. denied* Sept. 21, 2017.

## II.   Factual Background

The TCCA summarized the evidence presented at trial, and the court will provide that summary here as context for the petitioner's claims:

> Officer [Joshua] Lewis testified that he was an officer with the City of Lebanon Police Department. He and a fellow officer were dispatched to the Plaza Motel on December 23, 2008, at approximately 4:45 a.m., to respond to a 9–1–1 call. When they arrived, they were unable to enter the victim's room, so they obtained a master key from hotel personnel. Upon entering the room, Officer Lewis observed the room "was in shambles." Personal belongings were strewn about the room, and the mattress had been removed from the bed and was lying in front of the doorway. He and Officer Stone began to "clear" the room to ensure that the room was safe before allowing emergency personnel to enter the room, during which time Officer Lewis saw the victim lying on the box springs of the bed. He testified that there was "blood everywhere," including the floor, the mattress, the box springs, the ceiling, and the walls. After notifying medical personnel that the room was "clear," Officer Lewis approached the victim and asked him what had happened. The victim stated that "he was laying [sic] in bed . . . [and] . . . awaken[ed] to a big black guy beating him with a pipe." Officer Lewis assisted emergency personnel in loading the victim into the ambulance and secured the room.
>
> On cross-examination, Officer Lewis confirmed that the victim's hotel room door was locked when they arrived and that he did not observe any signs of forced entry. He stated that the victim was conscious but lying on the box springs of the bed, covered in blood.

---

[2] This citation is to the petitioner's second *pro se* post-conviction petition. His first (Doc. No. 11-12 at 9–25) was summarily denied (*id.* at 40).

. . . .

. . . Officer Lewis, . . . clarified that the victim actually made two statements to him. One statement occurred in the hotel room during the initial contact. After Officer Lewis had secured the room and the victim was in the ambulance, Officer Lewis approached the victim and inquired as to the identity of the assailant. During that statement, the victim indicated that the black male "lived down the way." Officer Lewis recognized the seriousness of the victim's injuries and attempted to gather additional information, including perhaps a dying declaration, before the victim was transported. . . .

. . . .

The next witness was John Wayne Engle, who lived in close proximity to the Plaza Motel. On the morning of December 23, 2008, he was walking his dog between 6:00 and 6:30 a.m. when he discovered checkbooks lying on the ground between his residence and the residence next door to him. He noticed several police officers in the vicinity and turned the checkbooks in to an officer.

Officer Matthew Dedman, an officer with the City of Lebanon Police Department, testified that he was working on December 23, 2008. His responsibility that day was to secure the crime scene van. When he was on duty, someone approached him and handed him some checkbooks. He turned the checkbooks over to Detective Massey.

The State next called Shirley Bogle, who resided in the Plaza Trailer Park, which was located directly behind the Plaza Motel. She testified that she placed a 9–1–1 call around 4:30 a.m. on December 23, 2008. The call was precipitated by [the Petitioner's] arguing with a pregnant female. Ms. Bogle asked [the Petitioner] and the female to move because they were standing very close to her dog, who was chained, and she feared that the dog might bite one of them. She observed [the Petitioner] holding what appeared to be an umbrella and something "hanging[,] like a purse or something . . . ." Ms. Bogle indicated that she called 9–1–1 because [the Petitioner] and the female were in a "fight or a fuss," and because the female was pregnant, Ms. Bogle was concerned that [the Petitioner] might harm her. In her call, she asked the police to patrol the area; she did not ask them to investigate or take any other action. She identified [the Petitioner] in court.

On cross-examination, Ms. Bogle stated she was positive that the female was pregnant because she had seen her previously but did not know her personally. She acknowledged that what she thought was an umbrella could have been a flashlight. She confirmed that [the Petitioner] lived in the same community, and she pointed out his residence on a map.

The State's next witness was Tabitha Donnelly. She pleaded guilty to criminal charges arising from this incident and received a sentence of fifteen years, to be

served at 100% release eligibility. On the day in question, she had borrowed the victim's Jeep. Around 4:00 a.m., she was visiting an acquaintance and "was getting high" when [the Petitioner] knocked on the back door. The owner of the home instructed Ms. Donnelly to open the door for him. Once inside, [the Petitioner] asked Ms. Donnelly what she was about to do, and she told him that she was going to return the victim's Jeep. [The Petitioner] asked Ms. Donnelly if the victim usually had money in his possession, and she responded affirmatively. She asked [the Petitioner], "Why, do you want to rob him? Don't hurt him, just scare him." [The Petitioner] responded, "S**t, it's Christmastime. I ain't got no more dope. My pockets is [sic] empty. I'm down with whatever."

Ms. Donnelly and [the Petitioner] then left, and she drove [the Petitioner] to the Plaza Motel at the entrance of the parking lot. She continued through the parking lot and parked outside of the victim's room. She entered the victim's room and sat down in a chair. The victim asked Ms. Donnelly if she had locked the Jeep. She answered that she had not, and she walked outside to do so. At that point, [the Petitioner] walked into the room. [The Petitioner] approached the victim, who was in bed, and asked for all of his money. Ms. Donnelly opined that the victim was aware of [the Petitioner's] intentions and leaned back so that he could kick [the Petitioner], but [the Petitioner] produced a steering wheel lock and struck the victim.

Ms. Donnelly stated that she stood in the doorway in shock, saying, "Please quit hitting him." [The Petitioner] did not stop the attack. As the victim and [the Petitioner] fought, [the Petitioner] pulled the victim's foot and dragged the victim and the mattress upon which he was lying onto the floor. [The Petitioner] ordered Ms. Donnelly to take the victim's money, so she stepped across the mattress and box springs to look for his wallet, which she assumed was under the bed. When she found nothing there, Ms. Donnelly fled from the room followed by [the Petitioner]. She noted that when [the Petitioner] left, he had taken the victim's wallet, some checkbooks, a bowl of coins, and the weapon he used in the attack. They ran into the Plaza Trailer Park. They stopped in front of a trailer where a pit bull was chained outside. They began to argue, and the owner of the trailer, a female, came outside and asked them to move away from her trailer. Ms. Donnelly was arrested ten minutes later. Later that day, Detective Massey interviewed her, and she gave a statement recounting the events. Ms. Donnelly identified [the Petitioner] at trial.

On cross-examination, Ms. Donnelly admitted that the victim was "a trick" to her, meaning that she would "do things . . . for money." She acknowledged that she was not pregnant on the date in question. She further admitted that her intention was to assist [the Petitioner] in robbing the victim but not hurting him. Ms. Donnelly stated that she did not touch the steering wheel lock but that [the Petitioner] must have retrieved it from the victim's Jeep.

Ms. Donnelly agreed that she had the victim's blood on her shoes and a "splatter of blood" on her pants when she was arrested. She confirmed that she stayed in the

4

victim's room on the inside of the door during the attack, that she entered the room briefly in an attempt to retrieve the victim's wallet, and that she never touched the victim. She did not remove any of the victim's belongings. Ms. Donnelly stated that after her interview with Detective Massey, he drove her to the Plaza Trailer Park to assist him in retrieving the weapon. Although she believed she knew where the weapon was located, they were unsuccessful in recovering it.

Ms. Donnelly identified a photograph of an item that bore the word "club" on it. She did not recall having seen the item in the victim's Jeep or touching the item while she was in the Jeep. She admitted having received narcotics from [the Petitioner] on occasion. Had she received any proceeds from the robbery of the victim, she intended to use the money "to get high."

The State called the victim as its next witness. He was sixty-three years old at the time of trial. At the time of the incident, he had resided at the Plaza Inn Motel for eight to ten years. The victim testified that he suffered injuries to his skull and a finger as a result of the attack on him. However, he did not recall how the attack occurred and did not remember anything about the events of the day in question. His first memory thereafter was waking up in the rehabilitation area of Vanderbilt Hospital. He did not know who attacked him. The victim did not remember Tabitha Donnelly, either.

The State's next witness was Detective Scott Massey with the Lebanon Police Department. He responded to the Plaza Motel around 5:30 a.m. on December 23, 2008. When he arrived, Officers Lewis and Stone were on the scene, and the ambulance was en route to the hospital. When Detective Massey saw the size of the room, he requested assistance from the Crime Scene Team because it was larger than he could process by himself. He recalled receiving the victim's checkbooks from Officer Dedman. He left the motel around 7:00 a.m. to return to the police department. He developed an idea, based on items he observed in the hotel room, that a female had been there, so he checked to see if any female with whom law enforcement was familiar had been arrested. He learned that Tabitha Donnelly had, in fact, been arrested that morning in close proximity to the crime scene. He asked that Ms. Donnelly be brought from the jail so he could speak with her and also requested to examine the clothing she had been wearing. He noticed blood on Ms. Donnelly's shoes and also noted that Ms. Donnelly had been wearing a very large, dark-colored "hoodie" style sweatshirt and sweat pants. He forwarded Ms. Donelly's clothing to the crime laboratory. Ms. Donnelly gave Detective Massey a statement implicating [the Petitioner] then accompanied him to the hotel around 9:30 or 9:40 a.m. on December 23 to direct officers to the assault weapon. However, their attempt to locate the weapon was unsuccessful.

Through the course of the investigation, Detective Massey learned where [the Petitioner] resided. He returned to the trailer park during the morning of December 23 and knocked on the door. [The Petitioner] opened it, turned around, and walked to the sofa, where he sat down. He looked as though he had been asleep. He was

5

wearing boxer shorts and had a piece of toilet paper inside his nose with dried blood on it. [The Petitioner] explained that he was trying to stop a nose bleed. From the door, Detective Massey asked [the Petitioner] what time he arrived at his home the previous night. [The Petitioner] responded that he had been at home all night. Detective Massey requested that [the Petitioner] get dressed and accompany him to the police department.

Later in the day, Detective Massey obtained a search warrant for [the Petitioner's] trailer. He also requested assistance from the Crime Scene Team in searching the area surrounding [the Petitioner's] trailer. During that search, Detective Massey noticed that the underpinning of a neighboring trailer had been pulled back. He looked under the trailer and observed a bed sheet located approximately in the middle of the area under the trailer. He crawled into the space and pulled the sheet back, revealing a towel and the club that had been described by Ms. Donnelly as the weapon used by [the Petitioner]. Detective Massey later found the other half of the club's mechanism behind the passenger seat of the victim's Jeep.

On cross-examination, Detective Massey stated that as part of the investigation, he obtained buccal swabs from the victim, Ms. Donnelly, and [the Petitioner]. At trial, he identified photographs of shoe prints that were left on the victim's mattress and on a piece of paper. He also testified that witnesses whom they interviewed indicated that a pregnant female and a white male had attempted to "jimmy" the lock of the victim's door a few days prior to the assault. The witnesses indicated that the female they had previously seen was not Ms. Donnelly, saying, "[N]o, its not the pregnant female that we seen [sic] tonight. It's a different girl."

Detective Massey discussed another case in the area involving Ms. Donnelly but stated that she was not a suspect in the case. Rather, she was with the victim at the time when a slightly-built black male entered that victim's home and tried to steal his wallet. Detective Massey confirmed that no identifiable latent fingerprints were obtained from the crime scene. He also acknowledged that no physical evidence from the crime scene implicated [the Petitioner] and that the search of [the Petitioner's] trailer rendered no incriminating evidence. [The Petitioner] declined to make a statement to Detective Massey.

Dr. Jarod McKinney testified that he was a professor of emergency medicine at Vanderbilt University and that he also worked in the emergency department of Vanderbilt Hospital. The trial court accepted Dr. McKinney as an expert in the field of medicine. Dr. McKinney treated the victim when he was admitted into the emergency department. The victim suffered multiple skull fractures, facial fractures, and intracranial bleeding. He described the intracranial bleeding as being potentially life-threatening. He stated that it would have taken four to six weeks for [the victim's] fractures to heal. Although [the victim] presented in a conscious state, he experienced a seizure after the CAT scan and awakened later.

6

Special Agent Forensic Scientist Mark Dunlap with the Tennessee Bureau of Investigation next testified as an expert in the fields of serology and DNA analysis. He testified that exhibit 22, which contained the bed sheet, towel, and club, contained the victim's DNA. A blood stain on Ms. Donnelly's sweatshirt could not be tested further for DNA because the blood was likely transferred there by being packaged together with the sweat pants. The blood stain on her pants contained DNA from the victim as the major contributor. Some of the areas indicated that Ms. Donnelly was the minor contributor, but other stains contained DNA from a minor contributor that was insufficient for further testing. Special Agent Dunlap obtained the victim's DNA from Ms. Donnelly's shoes. The victim's checkbooks were tested and contained DNA from the victim as a minor contributor and from [the Petitioner] as a major contributor. No DNA was obtained from blood stains on the doorframe of the victim's room, the scrapings from [the Petitioner] fingernails, or blood stains around the victim's bathroom. A knife found in the victim's room tested positive for the presence of his own DNA.

*Jackson*, 2017 WL 2117027, at *1–5 (quoting *Jackson*, 2013 WL 5675466, at *1–6).

## III.    Asserted Claims

The petitioner asserts that there is insufficient evidence to support his convictions and that trial counsel was ineffective in three ways: (1) failing to call his mother and girlfriend to testify as alibi witnesses; (2) coercing him to not testify at trial; and (3) failing to investigate and present proof of his "social, medical, and mental health history." (Doc. No. 1 at 5–8, 16–18.)

## IV.    Standard of Review

Federal habeas relief for state prisoners is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Under AEDPA, a claim "adjudicated on the merits" in state court cannot be the basis for federal relief unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was

7

unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"—instead, the federal court must find that the state court's application was "objectively unreasonable." *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). State-court factual determinations are only unreasonable "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was

'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011)

(citing *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011)).

## V.    Analysis

The respondent concedes that the claims in the Petition were adjudicated on the merits in

the state court and argues that the TCCA's rejection of these claims was not unreasonable. (Doc.

No. 12 at 2, 12–22.) The court agrees.

### A.    Sufficiency of the Evidence

The petitioner first asserts that there is insufficient evidence to support his convictions for

especially aggravated robbery and aggravated assault. (Doc. No. 1 at 16–18.) The TCCA rejected

this claim as follows:

> The standard for appellate review of a claim challenging the sufficiency of the
> State's evidence is "whether, after viewing the evidence in the light most favorable
> to the prosecution, any rational trier of fact could have found the essential elements
> of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319
> (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App.
> P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a
> claim of insufficient evidence, appellant must demonstrate that no reasonable trier
> of fact could have found the essential elements of the offense beyond a reasonable
> doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether
> the conviction is predicated on direct or circumstantial evidence, or a combination
> of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551
> S.W.2d 329, 331 (Tenn. 1977).
>
> On appellate review, "'we afford the prosecution the strongest legitimate view of
> the evidence as well as all reasonable and legitimate inferences which may be
> drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d
> 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State
> v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving
> the credibility of witnesses and the weight and value to be given the evidence, as
> well as all factual disputes raised by the evidence, are resolved by the jury as trier
> of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788
> S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the
> State all reasonable inferences from the evidence and resolved all conflicts in the
> testimony in favor of the State; as such, we will not substitute our own inferences
> drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-
> evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835;

*see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Especially aggravated robbery, as indicted in this case, is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is "[a]ccomplished with a deadly weapon[ ] and [w]here the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-401, -403 (2010). At trial, the State presented the testimony of Tabitha Donnelly, who placed appellant at the scene and established him as the sole attacker. Although neither appellant's fingerprints nor shoe prints were found at the crime scene, police received from a citizen several of the victim's checkbooks that had been stolen from his motel room. The checkbooks contained DNA from appellant as the major contributor, which established his identity as one of the perpetrators. Ms. Donnelly's testimony established that appellant stole property belonging to the victim and accomplished the theft by using part of a steering wheel locking mechanism to beat the victim, which meets the definition of a deadly weapon. *See* Tenn. Code Ann. § 39-11-106(a)(5)(B) (2010) (defining "deadly weapon" as "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury"). The deadly weapon was subsequently found under a trailer located in close proximity to appellant's trailer. Expert testimony established that the victim suffered serious bodily injury. The evidence was sufficient to establish appellant's guilt of especially aggravated robbery.

As indicted in this case, aggravated assault is defined as intentionally, knowingly, or recklessly causing bodily injury to another by the use or display of a deadly weapon. Tenn. Code Ann. §§ 39-13-101, -102 (2010). The victim's DNA was found on the steering wheel mechanism, providing further proof that the mechanism was the deadly weapon appellant utilized and corroborating Ms. Donnelly's testimony. Medical testimony established the degree of appellant's bodily injury. The evidence was sufficient to convict appellant of aggravated assault. Appellant is not entitled to relief on this claim of error.

*Jackson*, 2013 WL 5675466, at *10–11.

As this excerpt reflects, the TCCA correctly identified the federal standard governing claims for sufficiency of the evidence, as set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). "Under *Jackson*, habeas corpus relief is appropriate based on insufficient evidence only where the court finds, after viewing the evidence in the light most favorable to the prosecution, that no

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (quoting *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007)). On federal habeas review, this standard "commands deference at two levels": "First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Id.* (citing *Parker*, 506 F.3d at 448).

As to the essential elements of the offenses, especially aggravated robbery required the state to prove beyond a reasonable doubt that the petitioner committed "'the intentional or knowing theft of property from the person of another by violence or putting the person in fear' that [was] '[a]ccomplished with a deadly weapon[] and [w]here the victim suffer[ed] serious bodily injury.'" *Jackson*, 2013 WL 5675466, at *11 (quoting Tenn. Code Ann. §§ 39-13-401, -403). Aggravated assault, meanwhile, required the state to prove beyond a reasonable doubt that the petitioner "intentionally, knowingly, or recklessly caus[ed] bodily injury to another by the use or display of a deadly weapon." *Id.* (citing Tenn. Code Ann. §§ 39-13-101, -102).

Tabitha Donnelly's testimony established that the petitioner "stole property belonging to the victim and accomplished the theft by using part of a steering wheel locking mechanism to beat the victim, which meets the definition of a deadly weapon." *Jackson*, 2013 WL 5675466, at *11 (citing Tenn. Code Ann. §§ 39-11-106(a)(5)(B)). This weapon was "found under a trailer located in close proximity to [the petitioner's] trailer" and had the victim's DNA on it. *Id.* The victim's stolen checkbooks also "contained DNA from [the petitioner] as the major contributor." *Id.* And the extent of the victim's injury was established by Dr. Jarod McKinney, an expert in the field of medicine, who testified that the victim suffered "multiple skull fractures, facial fractures, and intracranial bleeding." *Id.* at *5. Dr. McKinney "described the intracranial bleeding as being

11

potentially life-threatening." *Id.* This evidence "was sufficient for a rational trier of fact to find the essential elements of [the petitioner's] crimes beyond a reasonable doubt." *See Hill v. Mitchell*, 842 F.3d 910, 934 (6th Cir. 2016).

The petitioner disagrees for four reasons, but none alter the court's conclusion. First, the petitioner correctly notes that the victim did not identify him as the attacker at trial. (Doc. No. 1 at 16.) Indeed, the victim testified that did not remember anything about the events of the day he was assaulted, including who committed the assault. (Doc. No. 11-3 at 94–95.) But this testimony is unnecessary to support the petitioner's conviction, and the TCCA did not rely on the victim's testimony in rejecting the insufficient-evidence claim. Additionally, Dr. McKinney, a medical expert, testified that the victim had "multiple skull fractures, facial fractures, and intracranial bleeding" when he was admitted to Vanderbilt Hospital's emergency department following the incident. *Jackson*, 2013 WL 5675466, at *5. Given these serious cranial injuries, the victim's inability to recall the events of the day of the assault does not justify upending the jury's verdict in this case.

Second, the petitioner contends that Tabitha Donnelly was not credible because her testimony was the "product of a plea deal" and she had a "history of dishonesty." (Doc. No. 1 at 16.) However, a habeas claim of insufficient evidence resting on "an allegation involving witness credibility" cannot succeed, as witness credibility is "clearly the province of the jury." *Tyler v. Mitchell*, 416 F.3d 500, 505 (6th Cir. 2005) (citations omitted); *Moreland v. Bradshaw*, 699 F.3d 908, 920 (6th Cir. 2012) (quoting *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002)) ("In general, attacks on witness credibility are 'simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence.'"). Moreover, the court notes that the jury

heard evidence of the same credibility issues the petitioner now raises in this case.[3] Even so, the jury still determined that there was sufficient evidence to convict the petitioner of the charged offenses. The petitioner's argument on this point is therefore unpersuasive. *See Hill*, 842 F.3d at 934 (citing *Herrera v. Collins*, 506 U.S. 390, 401–02 (1993)) (rejecting attacks on witness credibility because the court "cannot substitute [its] own determination of guilt in place of the jury's, and [it] cannot reweigh the evidence").

Third, the petitioner contends that Shirley Bogle's testimony did not, as the state argued, corroborate Donnelly's testimony. (Doc. No. 1 at 17.) As context for this argument, Donnelly testified that she and the petitioner ran to the Plaza Trailer Park after the incident, where they stood near a trailer with a barking dog in the front yard, "arguing back and forth over why he did what he did." (Doc. No. 11-3 at 70.) According to Donnelly, a woman came to the front porch and told them to move so the dog would not bite them. (*Id.*) Bogle, meanwhile, testified that she lived at the Plaza Trailer Park and heard her dog barking around 4:30 a.m. on the day of the incident. (*Id.* at 53–54.) Bogle testified that she witnessed the petitioner arguing with a woman outside her trailer and that she asked them to move so her dog would not bite them. (*Id.* at 54–56.) And as the petitioner points out, Bogle testified that the petitioner was arguing with a pregnant woman, while Donnelly testified that she was not pregnant at the time. (Doc. No. 1 at 17.) Regardless of this discrepancy, "a court 'faced with a record of historical facts that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Smith v. Cook*, 956 F.3d 377, 396 (6th Cir. 2020) (quoting *Jackson*,

---

[3] On direct examination, the state elicited Donnelly's testimony that she pleaded guilty to criminal charges arising from this incident. (Doc. No. 11-3 at 65.) And on cross-examination, Donnelly specified that her charge was especially aggravated robbery and her sentence was 15 years' imprisonment. (*Id.* at 84–86.) The petitioner's counsel also questioned Donnelly about prior convictions involving dishonesty under Tennessee law, including forgery, passing a forged instrument, burglary, fraudulent use of a credit card under five hundred dollars, and theft under five hundred dollars. (*Id.* at 72, 81–84.)

13

443 U.S. at 326). Accordingly, this variation in testimony between Bogle and Donnelly does not entitle the petitioner to relief.

Fourth and finally, the petitioner argues that his genetic material was found on one of the victim's checkbooks in a "highly questionable" manner, shortly after a detective collected a DNA sample from him about four months after his arrest. (Doc. No. 1 at 18.) The implication, here, appears to be that the petitioner's DNA was transferred to the checkbook in question from his second DNA sample. This assertion is not supported by any evidence. Nonetheless, the petitioner's trial counsel elicited testimony from Mark Dunlap, an expert in serology and DNA analysis, that it is possible to transfer DNA from a sample to an object such as a piece of paper. (Doc. No. 11-4 at 46.) The jury considered this testimony, along with all of the other evidence presented in the case, and found the petitioner guilty beyond a reasonable doubt. Thus, the petitioner's speculative attempt to undermine the DNA evidence is not sufficient to set aside the jury verdict.

In sum, "[t]he jury in this case was convinced, and the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Smith*, 956 F.3d at 396 (quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012)). For the reasons stated above, the court answers that question "no." This claim is without merit.

### B.  Ineffective Assistance of Trial Counsel

The petitioner next asserts that trial counsel was ineffective in three ways. The federal law governing the adequacy of a criminal defendant's representation is defined in *Strickland v. Washington,* 466 U.S. 668 (1984). *Premo v. Moore*, 562 U.S. 115, 121 (2011). The TCCA correctly identified this standard before rejecting the petitioner's claims on the merits. *Jackson*, 2017 WL 2117027, at *8.

14

Under *Strickland*, a petitioner must show (1) deficient performance and (2) prejudice to the defendant. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citing *Strickland*, 466 U.S. at 687). "[A] court deciding an ineffective assistance claim" need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. Counsel's performance is deficient where it falls "below an objective standard of reasonableness." *Id.* at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Further, when a petitioner raises an exhausted claim of ineffective assistance in a federal habeas petition, "[t]he pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standard," but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. This amounts to a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). Accordingly, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.*

### 1.    Failure to Call Alibi Witnesses

First, the petitioner asserts that counsel was ineffective for failing to call his mother and girlfriend to testify at trial because they would have testified that the petitioner was at home when

the victim was robbed and assaulted. (Doc. No. 1 at 5.) According to the petitioner, counsel did not explain why his girlfriend's testimony would not have been helpful. (*Id.*)

The TCCA concluded that the petitioner failed to demonstrate both deficiency and prejudice as to the claim. As to deficiency, the TCCA explained:

> [T]he post-conviction court accredited trial counsel's testimony that he told the Petitioner his mother would have testified that he left the house during the night and that his wife would have testified that he handed her bloody clothes to wash. Specifically, the post-conviction court found that trial counsel's testimony was "a more reasonable, credible and believable explanation as to why the two witnesses were not called to support an alibi defense."

*Jackson*, 2017 WL 2117027, at *8. And as to prejudice, the TCCA noted that the petitioner "failed to call the witnesses to testify at the post-conviction hearing" and that it would "not speculate on what benefit the witnesses might have offered to the Petitioner's case." *Id.*

The TCCA's determination of both *Strickland* prongs was reasonable. A federal habeas court "may not lightly ignore" a state court's "credibility findings; they are entitled to 'great deference' and 'must be sustained unless [they are] clearly erroneous,' particularly in the context of AEDPA-limited habeas review." *Howell v. Hodge*, 710 F.3d 381, 386 (6th Cir. 2013) (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam)). Here, the state court credited counsel's explanation for not calling the petitioner's mother and girlfriend to testify, and the petitioner has not demonstrated that this credibility determination was clearly erroneous. When crediting that explanation, the court found that it was sound strategy to avoid testimony that the petitioner "left the house during the night," and that he "handed [his girlfriend] bloody clothes to wash." Thus, it was reasonable for the TCCA to determine that counsel was not deficient in declining to call the petitioner's mother and girlfriend to testify. *See Yancey v. Haas*, 742 F. App'x 980, 984 (6th Cir. 2018) (citations omitted)) ("[D]eciding which witnesses to present at trial is a matter of strategy.").

Further, because the petitioner's proposed alibi witnesses did not testify at the post-conviction hearing, it was also reasonable for the state court to conclude that the petitioner failed to demonstrate prejudice. *See Hutchison v. Bell*, 303 F.3d 720, 748–49 (6th Cir. 2002) (citations omitted) ("[A] petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material."). This claim is without merit.

### 2.     Coercing the Petitioner to Not Testify as Trial

Next, the petitioner asserts that counsel coerced him to not testify at trial. (Doc. No. 1 at 6–7.) At the post-conviction hearing, counsel testified that one of his concerns about the petitioner testifying was that the petitioner "made certain disclosures that would prevent [him] from ethically putting [the petitioner] on the stand to testify that he wasn't there." (Doc. No. 11-13 at 33–34.) The petitioner now argues that the remedy for this concern was for counsel to "seek to withdraw . . . rather than refuse to put [him] on the stand." (Doc. No. 1 at 7–8.)

The TCCA rejected this claim because "the trial court advised the Petitioner of his right to testify," and because "[t]he Petitioner acknowledges that he made the choice not to testify upon the advice of counsel." *Jackson*, 2017 WL 2117027, at *8.

The record supports this determination. At trial, after the state rested its case, the court questioned the petitioner under oath and outside the presence of a jury regarding his right to testify:

Q.     Mr. Jackson, I need for you to stand up and raise your right hand please (witness sworn). I need to ask you a few questions about [the decision to testify or not testify]. Mr. Jackson, you may put your hand down. Would you state your name for the record, please, sir.

A.     Felton Nev[i]ll[e] Jackson, Sr.

Q.     Mr. Jackson, I want to go over a few things with you and make sure you do understand them. Now you have the right not to testify, okay. That is your right. You don't have to present any proof at all. And if you do choose not

> to testify, I have a specific instruction for the jury to where they cannot draw any inference from that and they cannot hold that against you. Do you understand?
>
> A.   Yes, sir.
>
> Q.   However, you also have an absolute right to testify, and it is your decision and your decision alone to make that decision as to whether or not you want to testify. So I want to ask you this, have you consulted with your attorney, Mr. Parrish, to discuss the pros and cons of you testifying in this case or not testifying? Have you discussed that with him?
>
> A.   Yes, sir.
>
> Q.   And after being advised of the advantages and disadvantages, are you voluntarily and personally waiving your right to testify knowing that regardless of what Mr. Parrish says it is your decision and your decision alone. So you have made that decision?
>
> A.   Yes, sir.
>
> Q.   And what is your decision, Mr. Jackson?
>
> A.   Not to testify.

(Doc. No. 11-4 at 54–56 (emphasis added).) Although the petitioner now asserts that counsel coerced him, the court may rely on his sworn testimony to the contrary because "solemn declarations in open court carry a strong presumption of verity." *Cummins v. Phillips*, No. 1:16-cv-00023, 2017 WL 6554889, at *18 (M.D. Tenn. Dec. 22, 2017) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)) (rejecting similar claim due to petitioner's previous testimony that he knowingly and voluntarily waived his right to testify).

Moreover, at the post-conviction hearing, although the petitioner testified that he did not recall this exchange (Doc. No. 11-13 at 17, 23) and that he did not understand he was the ultimate decisionmaker about whether to testify (*id.* at 14, 26), the petitioner acknowledged that counsel did not threaten him in any way (*id.* at 21). Rather, the petitioner testified that counsel told him

"he d[idn't] think it would be a good idea for [him] to get on the stand," and that the petitioner "just went along" because he "felt that [counsel] had [his] best interest." (*Id.* at 14.)

Thus, the TCCA reasonably applied *Strickland* to conclude that counsel was not ineffective for coercing the petitioner not to testify at trial. This claim will be denied.

### 3. Failure to Investigate the Petitioner's History

Lastly, the petitioner asserts that counsel was ineffective for failing to investigate his "social, medical, and mental health history." (Doc. No. 1 at 8.) Specifically, the petitioner seems to contend that counsel should have mounted a defense based on his "extensive history of mental illness," as this history was a topic of discussion with counsel. (*Id.*)

The TCCA again concluded that the petitioner failed to demonstrate both deficiency and prejudice as to this claim:

> The post-conviction court found that the Petitioner did not inform trial counsel about any potential mental health issues. Moreover, trial counsel testified that he did not observe anything concerning about the Petitioner's mental or physical health. Further, the Petitioner did not testify that any of his mental or physical conditions affected the outcome and did not have an expert witness to testify at the post-conviction hearing regarding his mental health.

*Jackson*, 2017 WL 2117027, at *8.

This determination was reasonable. As to deficiency, the state court found counsel's side of a discrepancy in testimony to be credible. At the post-conviction hearing, the petitioner testified that he has been diagnosed with depression, bipolar disorder, and anxiety. (Doc. No. 11-13 at 15.) And while in jail during the lead up to trial, the petitioner testified that he took medication for these diagnoses, saw a psychiatrist, and discussed his diagnoses with counsel. (*Id.* at 15–16.) Counsel, on the other hand, testified that the petitioner's mental health was not a topic of discussion and that he heard about the issue for the first time on the day of the post-conviction hearing. (*Id.* at 38.)

19

Counsel also testified that, in his interactions with the petitioner before trial, he did not observe anything to make him think that it was necessary to obtain a mental health evaluation. (*Id.* at 34.)

The petitioner has not demonstrated that the state court's credibility finding in favor of counsel was "clearly erroneous." *See Howell*, 710 F.3d at 386 (quoting *Felkner*, 562 U.S. at 598). The court, therefore, must defer to the state court's finding. And when crediting counsel's testimony that he did not have any reason to investigate the petitioner's mental health history, it was reasonable for the TCCA to conclude that counsel was not deficient for failing to do so. It was also reasonable for the TCCA to conclude that the petitioner has not demonstrated prejudice as to this claim, as he does not explain how asserting a mental health defense would have had a reasonable probability of resulting in a different outcome at trial. This claim is without merit.

## VI.    New Arguments and Claims in the Petitioner's Reply

In the petitioner's untimely reply, he asserts a new theory in support of his insufficient-evidence claim (Doc. No. 13 at 2–4), a new sentencing claim (*id.* at 4–5), and three new claims of ineffective assistance of trial counsel (*id.* at 5). The court therefore considers the petitioner's reply as a request to amend the petition.

The respondent argues that it would be futile to allow the petitioner to add the new arguments and claims because they are untimely and procedurally defaulted. (Doc. No. 16 at 2–7.) The petitioner responds by asserting cause to excuse the procedural default. (Doc. No. 24.) He also asserts that the proposed new claims are the subject of a motion to correct illegal sentence in state court, and he requests a stay of this action pending the resolution of that motion. (Doc. No. 24 at 1; Doc. No. 27.) The respondent opposes a stay. (Doc. No. 29.)

20

The court, therefore, must address the petitioner's request for a stay before turning to his request to amend. For the following reasons, the petitioner's request for a stay will be denied, and the court finds that it would be futile to allow him to amend the petition to add his proposed claims.

## A.     Request for a Stay

A state prisoner generally must "fully exhaust all of their claims in the state courts before seeking federal review. *In re Bowen*, 436 F.3d 699, 701 (6th Cir. 2006) (citing *Rose v. Lundy*, 455 U.S. 09, 510 (1982)). To satisfy this requirement, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when that claim is presented to the Tennessee Court of Criminal Appeals. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39).

The petitioner has not presented his proposed claims to the TCCA, as they are the subject of a motion to correct illegal sentence currently pending in Wilson County Criminal Court. Accordingly, if the court were to consider the proposed claims part of the petition, it would be faced with "a 'mixed' petition," which is a petition "containing claims that the petitioner has pressed before the state courts and claims that he has not." *Harris v. Lafler*, 553 F.3d 1028, 1031 (6th Cir. 2009) (citations omitted).

As stated above, the petitioner requests that the court stay this action pending the resolution of his motion to correct illegal sentence. In limited circumstances, a district court may hold a "mixed" petition in abeyance to allow a petitioner to present unexhausted claims in state court. *Rhines v. Weber*, 544 U.S. 269, 277 (2005). This "stay-and-abeyance" option, however, is

available only where "the petitioner can: 1) show good cause for failing to present the claims before the state court in the first instance, and 2) show that his unexhausted claims are not 'plainly meritless.'" *Wagner v. Smith*, 581 F.3d 410, 419 (6th Cir. 2009) (quoting *Rhines*, 544 U.S. at 278). The respondent argues that the petitioner has not made either showing, and the court agrees.

### 1. Good Cause

The petitioner seems to argue that he has good cause for failing to fully exhaust his proposed claims because post-conviction counsel did not raise them, despite the petitioner's urging. (Doc. No. 24 at 3.) This argument is unpersuasive. As the respondent notes, the petitioner's state post-conviction proceedings concluded on September 21, 2017, when the Tennessee Supreme Court denied his application for permission to appeal. *Jackson*, 2017 WL 2117027. The petitioner does not attempt to explain why he waited until December 2019—over two years later—to begin presenting his proposed claims to the state court by filing a motion to correct illegal sentence in Wilson County Criminal Court. (*See* Doc. No. 24 at 14; Doc. No. 27-1 at 9.) Indeed, if the petitioner knew enough about the proposed claims during his post-conviction proceedings to request that counsel raise them, then he cannot now argue that those claims are based on new information. *Cf. Jalowiec v. Bradshaw*, 657 F.3d 293, 305 (6th Cir. 2011) (finding good cause for failure to exhaust a claim based on materials first disclosed during discovery in district court habeas proceedings). The petitioner's request for a stay may be denied for this reason alone.

### 2. Plainly Meritless

A stay is also not warranted because the petitioner's proposed claims are plainly meritless.

#### a. Sufficiency of the Evidence

First, the petitioner asserts a new theory in support of his claim that there is insufficient evidence to support his conviction for especially aggravated robbery. Specifically, the petitioner

argues that, based on the evidence presented at trial, no rational juror could have found beyond a reasonable doubt that the victim suffered serious bodily injury. (Doc. No. 13 at 2–4.)

The Tennessee code defines "serious bodily injury" as bodily injury involving a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. Tenn. Code Ann. § 39-11-106(a)(36). At trial, the jury heard expert testimony from Dr. Jarod McKinney, the doctor who treated the victim when he was admitted to the emergency department at Vanderbilt Hospital. Dr. McKinney testified that the victim underwent a CAT scan, which showed that he suffered "multiple skull fractures, facial fractures[, and] intracranial bleeding." (Doc. No. 11-4 at 10–11.) Dr. McKinney described these injuries as painful and noted that fractures usually take four to six weeks to heal. (*Id.* at 11.) He also testified that "intracranial bleeding can be potentially life threatening." (*Id.*) Finally, Dr. McKinney testified that the victim had a seizure after the CAT scan. (*Id.*)

Moreover, Officer Joshua Lewis testified that, when he entered the victim's room after the incident, there was a significant amount of blood throughout the room, and this testimony is consistent with pictures of the scene published and shown to the jury. (Doc. No. 11-3 at 24–25, 28–29, 32–36 (testimony); Doc. No. 11-5 at 6–21 (pictures).) The victim himself testified that he "had [his] skull busted a time or two and a finger messed up," but he did not recall how it happened. (Doc. No. 11-3 at 94.) His first memory after the incident was "waking up at Vanderbilt a few days later in the rehab place." (*Id.*)

Given this testimony—expert medical testimony about the extent of the victim's injuries, Officer Lewis's testimony and accompanying photographs of the bloody crime scene, and the victim's testimony that he lost several days of memories as a result of the attack—there was more

than enough evidence for a rational juror to find beyond a reasonable doubt that the victim suffered a serious bodily injury. This proposed claim is plainly meritless.

### b.    Sentencing Claim

Next, the petitioner asserts a sentencing claim by invoking *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v. Washington*, 542 U.S. 296 (2004). (Doc. No. 13 at 4–5.) In *Apprendi*, the United States Supreme Court "held that[,] '[o]ther than the fact of a prior conviction,' the Due Process Clause of the Fourteenth Amendment requires that a jury find beyond a reasonable doubt 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum.'" *State v. Bise*, 380 S.W.3d 682, 693 (Tenn. 2012) (quoting *Apprendi*, 530 U.S. at 490). And in *Blakely*, the Supreme Court clarified that "the 'statutory maximum,' for purposes of *Apprendi*, is the sentence 'a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*.'" *State v. Pollard*, 432 S.W.3d 851, 857 (Tenn. 2013) (quoting *Blakely*, 542 U.S. at 303) (emphasis in original).

In 2005, Tennessee amended its sentencing statutes to ensure compliance with these decisions. *See Bise*, 380 S.W.3d at 696–99. These amendments allowed the trial judge to "sentence anywhere within the appropriate range." *Id.* at 698 (citation omitted). "[T]he United States Supreme Court explicitly approved Tennessee's statutory changes as constitutionally sound." *Id.* at 699 (citing *Cunningham v. California*, 549 U.S. 270, 294 n.18 (2007)).

Here, the petitioner was sentenced in July 2011 for offenses that occurred in December 2008. The petitioner, accordingly, was sentenced under Tennessee's post-2005 sentencing scheme. His sentencing range was 15 to 25 years' imprisonment (Doc. No. 11-6 at 5), and the court chose a within-range sentence of 25 years. Thus, the petitioner has not demonstrated that his sentence is inconsistent with *Apprendi* and *Blakely*, and this proposed claim is plainly meritless.

24

### c.      Ineffective Assistance of Trial Counsel

Finally, the petitioner asserts three new claims of ineffective assistance of trial counsel. Specifically, he asserts that counsel failed to: (1) "offer proof to test the state's theory of 'serious bodily injury'"; (2) "call other experts to rebut Dr. [McKinney's] testimony and findings"; and (3) meaningfully communicate with him about the progress of his case. (Doc. No. 13 at 5.)

The first and second claims are based on the same faulty premise as the proposed insufficient-evidence claim discussed above. That is, the petitioner is attempting to target the "serious bodily injury" element of his especially aggravated robbery charge, despite there being ample evidence to establish that element presented at trial. And given that evidence, the court concludes that the petitioner was not prejudiced by counsel's decision not to offer countervailing evidence or experts regarding the extent of the victim's injury.

The court also concludes that counsel was not deficient in this regard. Based on a review of the record, it is apparent that counsel's trial strategy included not drawing the jury's attention to the victim's injuries, as he did not cross-examine Dr. McKinley, he did not question the victim on this issue, and he did not mention the victim's injuries in closing argument. (*See* Doc No. 11-3 at 95–97; Doc. No. 11-4 at 12, 70–80.) This strategy was presumptively sound. *See Strickland*, 466 U.S. at 689.

That is especially so because parts of the record reflect that the victim's injuries were even more serious than shown by the evidence presented at trial. The victim and his sister submitted impact statements at sentencing. The victim stated that, as a result of the incident, he underwent surgery on his hand and face, stayed in the hospital for several weeks, and required prolonged rehabilitation. (Doc. No. 11-5 at 71–72.) The victim also stated that he was going blind in his right eye and suffered hearing loss. (*Id.* at 71.) The victim's sister added that the victim suffered brain

damage such that the victim did not "know [his sister] for months." (*Id.* at 74.) Thus, it was not deficient for counsel to avoid the topic of the victim's injuries.

Third, the petitioner asserts that counsel was ineffective for failing to meaningfully communicate with him about the progress of the case.[4] (Doc. No. 13 at 5.) Initially, this claim is plainly meritless because the petitioner does not explain how counsel's level of communication prejudiced him in any way. Based on the testimony of both the petitioner and counsel at the post-conviction evidentiary hearing, however, the court also concludes that counsel's communication was not deficient.

Most of the petitioner's testimony on this point was not necessarily inconsistent with that of counsel. That is, both parties testified that counsel met with the petitioner at least once or twice a month for the duration of counsel's representation. (Doc. No. 11-13 at 6–8 (the petitioner); *id.* at 29–30 (counsel).) Both parties testified that the petitioner was familiar with the evidence that would be used against him at trial. (*Id.* at 10 (the petitioner); *id.* at 37 (counsel).) And both parties testified that it was the petitioner's decision to go to trial and that he understood what the trial process would look like. (*Id.* at 10 (the petitioner); *id.* at 37 (counsel).) Given this testimony, the court cannot conclude that counsel's communications with the petitioner fell "below an objective standard of reasonableness." *See Strickland*, 466 U.S. at 687–88. This claim is plainly meritless.

In sum, it is the petitioner's burden to show that a stay is appropriate by demonstrating that there is good cause for his failure to present his proposed new claims to the state court in the first instance and that his proposed new claims are not plainly meritless. For the reasons stated above, the petitioner has not made either showing. Accordingly, the petitioner's request for a stay will be denied.

---

[4] The court notes that the petitioner asserted this claim at the initial stage of his post-conviction proceedings (Doc. No. 11-12 at 77–78), the trial court denied it (*id.* at 89), and the petitioner did not raise it on appeal.

26

### B.    Request to Amend

Finally, the court returns to the petitioner's request to amend. Rule 15 of the Federal Rules of Civil Procedure governs the amendment of habeas corpus petitions in federal court. *Mayle v. Fenix*, 545 U.S. 644, 655 (2005). Under Rule 15(a)(1), a party may "amend its pleading once as a matter of course" within either 21 days of serving it, or 21 days after the opposing party files a response or motion. "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Here, the petitioner may not amend as a matter of course because he did not file his reply within the necessary time period, and the respondent did not give written consent. Accordingly, the petitioner may only amend with the court's leave.

Federal courts "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "In evaluating the interests of justice, courts consider several factors, including 'undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment.'" *Oleson v. United States*, 27 F. App'x 566, 569 (6th Cir. 2001) (quoting *Coe v. Bell*, 161 F.3d 320, 341 (6th Cir. 1998)).

Here, the respondent argues that it would be futile to allow the petitioner to add the proposed new claims because they are untimely and procedurally defaulted. (Doc. No. 16 at 2–7.) But because the court addressed the merits of the petitioner's proposed new claims in the context of his request for a stay, judicial economy counsels the court to bypass the issues of timeliness and procedural default in this context. *See Payne v. Horton*, No. 2:18-CV-10231, 2018 WL 5981696, at *1 (E.D. Mich. Nov. 14, 2018) (citing *Smith v. State of Ohio Dep't of Rehab.*, 463 F.3d 426, 429 n.2 (6th Cir. 2006)) ("Because the statute of limitations does not constitute a jurisdictional bar to

habeas review, a federal court, can, in the interest of judicial economy, proceed to the merits of a habeas petition."); *Allen v. Mitchell*, 953 F.3d 858, 866–67 (6th Cir. 2020) (addressing the merits of a habeas claim despite its procedural default).

Thus, for the same reasons that the petitioner's proposed new claims are plainly meritless, the court concludes that amending the Petition to add them would be futile. *See Lyons v. Stovall*, 188 F.3d 327, 333 (6th Cir. 1999) (footnote omitted) (quoting *Cain v. Redman*, 947 F.2d 817, 820 (6th Cir. 1991)) ("[W]here 'the federal constitutional claim was plainly meritless and it would be a waste of time and judicial resources to require exhaustion,' nonexhaustion and procedural default should be excused.").

## VIII.  Conclusion

For these reasons, the claims in the petitioner's original petition do not entitle him to relief under Section 2254, his request for a stay will be denied, and it would be futile to allow him to amend the petition to include the new claims proposed in the reply. Accordingly, this action will be dismissed.

Because this constitutes a "final order adverse to" the petitioner, the court must "issue or deny a certificate of appealability." Habeas Rule 11(a). A certificate of appealability may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C.  § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Here, for the reasons stated throughout the court's analysis, the court concludes that the petitioner has not satisfied these standards and will deny a certificate of appealability.

28

An appropriate order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge